# UNITED STATES DISTRICT COURT

UNDER SEAL

for the

Eastern District of Virginia

DEC - 3

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No.1:12sw 1002
2122 21ST ROAD NORTH )
ARLINGTON, VIRGINIA )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
2122 21st Road North, Arlington, Virginia, as further described in Attachment A-2

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1546 | fraud and misuse of a passport |
| 18 U.S.C. § 1001 | false statement in a matter within the jurisdiction of the executive branch of the U.S. government |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

James P. Gillis

_____
*Applicant's signature*

Timothy S. Pappa, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____December 3, 2012_____

/s/ _____
John F. Anderson
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Hon. John F. Anderson, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC - 3

| | |
|---|---|
| IN RE SEARCH OF: | ) No. 1:12sw 1002 |
| | ) |
| 2122 21ST ROAD NORTH | ) |
| ARLINGTON, VIRGINIA | ) UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF TWO
## APPLICATIONS FOR SEARCH WARRANTS

Timothy S. Pappa, being duly sworn, says:

INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the FBI's Washington Field Office in the District of Columbia. I am assigned to a counterintelligence squad which investigates crimes involving national security. I entered on duty as an FBI Special Agent in July 2008.

2.     As discussed below, I submit that there is probable cause to believe that the operator of an online university, which has access to certain military records for thousands of U.S. military personnel, has fraudulently concealed her past history as an officer with the People's Liberation Army in the People's Republic of China by lying on immigration and naturalization forms, in interviews with federal agents conducting a background investigation, and to federal law enforcement agents.

3.     I submit the following affidavit in support of applications for search warrants for the company and residence of Yanping Chen. As discussed below, I submit that there is probable cause to believe that Chen has committed fraud and misuse of a passport, in violation of 18 U.S.C. § 1546, and made false statements in matters within the jurisdiction of the executive

branch of the U.S. government, in violation of 18 U.S.C. § 1001, and that fruits, evidence, and instrumentalities of both crimes, that is, the items listed in Attachment B, will be found at Chen's company, University of Management and Technology, 1901 North Fort Myer Drive, South Building, Suite 700, Arlington, Virginia, as further described in Attachment A-1, and Chen's residence, 2122 21st Road North, Arlington, Virginia, as further described in Attachment A-2.

4.    The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge, and observations during the course of this investigation, and my review of records, documents, and other physical evidence obtained during the course of this investigation, as well as the observations of other agents involved in this investigation. This affidavit contains information necessary to support probable cause. It is not intended to include each and every fact and matter observed by me or known to the United States.

STATEMENT OF PROBABLE CAUSE

*The University of Management and Technology*

5.    The University of Management and Technology (UMT) is an online university with offices in Arlington, Virginia, in the Eastern District of Virginia. UMT is a wholly-owned subsidiary of the Yankee Clipper Group, which is owned by Chen. Chen is the president and founder of UMT. Her husband, J. David Frame, is the dean and a professor at UMT.

6.    According to the UMT website, "UMT also has distance learning students enrolling in degree programs in China (including Hong Kong and Taiwan) . . . with support from local universities or colleges who partner with UMT." UMT  also provides training to visiting PRC government delegations according to a UMT employee.

-2-

7.     According to a UMT employee, UMT has had a contract to offer UMT courses toward professional certifications to employees of the Defense Acquisition University.  UMT also has a partnership with the Naval Postgraduate School and the U.S. Department of Homeland Security Center for Homeland Defense and Security, according to a UMT employee.  This allows any UMT student enrolled in a homeland security degree program or any UMT staff member to access a Center for Homeland Defense and Security database that holds over 98,000 homeland security policy and strategy documents.  UMT has provided training to several other U.S. government agencies as well, according to the Yankee Clipper website.

8.     The UMT website includes a September 2012 press release announcing that UMT had been selected as a "2013 Military Friendly School" by *G.I. Jobs* magazine.  According to the release, UMT has won this title two years consecutively.  UMT was to be listed in the annual *G.I. Jobs Guide to Military Friendly Schools*, distributed in print and digital format to hundreds of thousands of active and former military personnel.  About seventy percent of UMT's enrollment, or approximately 2,800 students, are affiliated with the U.S. military, according to the *G.I. Jobs* magazine.

9.     According to a link to the *G.I. Jobs* magazine web page, UMT, like similar schools, allows a student to receive transfer credit for past military training.  Most U.S. military branches will provide transcripts of a service member's military training so that it can be used to obtain potential transfer credits.  For example, according to one UMT student in the U.S. Navy, he had provided his Sailor-Marine American Council on Education Registry, or "SMART," transcript to UMT for consideration for transfer credits.  This included all military training he had received that was eligible to be translated into course credit.

10.    According to the UMT website, UMT offers a military scholarship, essentially a discount on the per-credit-hour tuition, that is available to active duty military personnel and to qualified veterans who were discharged honorably. Spouses of active duty personnel are also eligible for the scholarship. To establish their eligibility, UMT students have been asked to provide a form known as a DD-214, which shows a service member's military record. Trash covers of the UMT offices show that to demonstrate their eligibility, some service members had faxed materials to UMT using official cover sheets that contained information about the particular military units to which they were assigned.

*The SONIS Database*

11.    According to UMT personnel, "SONIS" is an online database unique to UMT, which contains students' course grades, as well as students' personal information, such as work and home addresses. Also, UMT student records are scanned and uploaded into the SONIS database.

12.    According to a former UMT student who had access to his SONIS account, he found every military document he had ever provided to UMT in his SONIS account. These documents included evaluation reports for each U.S. military training course he had completed, his discharge reports that included information related to his work on military aircraft, and U.S. military training transcripts that included descriptions of the courses he had taken. The student had provided these documents to UMT because he had been encouraged by UMT personnel to supply as much information as possible for him to qualify for transfer credits.

13.    A UMT personnel member with access to the SONIS system demonstrated to law enforcement agents how he was able to view information on certain students, including their

official email addresses, and information regarding the U.S. military facility or unit to which they were assigned. The user was able to organize the enrolled students by U.S. military facilities or military units, for example, "183rd Fighter Wing," "188th Fighter Wing," "Fairchild Air Force Base," and "Camp Murray."

14.     According to a UMT employee, UMT also has offices in Beijing, PRC, where personnel have administrator privileges to the SONIS database.

*Chen's History with the People's Liberation Army*

15.     On October 5, 2011, Chen and her husband, Frame, were recorded while talking to an active duty U.S. military officer who was then enrolled as a student at UMT. During the conversation, Chen mentioned that she had been a colonel in the PRC military:

| | |
|---|---|
| Student: | Now, how long have you been here? |
| Chen: | I have been here since 1987. |
| Frame: | She's a U.S. citizen. |
| Student: | You, were you, ex-military when you came here? |
| Chen: | I was, I was that, so let's not share military secrets (laughed). Yeah, I was ex . . . I was . . . I retired . . . I retired as a colonel. |

16.     On October 13, 2011, Chen was recorded while talking with a UMT employee. During the conversation, Chen discussed her background in the PRC military but told the employee that she would not want to publicize it. Chen also mentioned that her father was a three-star general. She also mentioned that her last military post was in the PRC space program.

| | |
|---|---|
| Employee: | I was talking to a student earlier and he was curious . . . whether some of [our instructors] are soldiers. |

-5-

|            | Of course I mentioned I was, and [another individual] and everything. At some point didn't you say that you were also . . . ? |
|------------|---|
| Chen:      | Yeah, I was in the military, yes. |
| Employee:  | I think you said you were. You never told me, what branch or what rank, I mean, I was just curious. |
| Chen:      | I was a retired as a colonel. |
| Employee:  | Really? |
| Chen:      | Mm hmm. |
| Employee:  | Is that something you would want to put as somewhere . . . ? |
| Chen:      | I . . . no, no, I would not because I was in the Chinese military, not in the U.S. military, so normally I would . . . I . . . [unintelligible (UI)] . . . I was in the military . . . military that's it . . . military training . . . very, very . . . you know, even run, even the discipline, everything the same, especially for the . . . [UI]. |
| Employee:  | What was your specialty? I mean, I guess they call it MOS. |
| Chen:      | I was a medical doctor, I was a medical corps. When I joined the military, I was the army age, even now 16. |
| Employee:  | Is it like compulsive? Is it kind of . . . |
| Chen:      | Was not. Was voluntary. |
| Employee:  | Because Israel is like that. |
| Chen:      | No, it was voluntary. It was voluntary. However, the reason I was able to join so early, that was during the Cultural Revolution, and essentially the |

government stop all the schooling, and my dad was, my dad was general in the military, so . . .

Employee: Did they have other rank because there's four generals here.

Chen: Mm hmm, mm hmm. My dad was like, at that point, they abolished rank but he was equivalent of a three-star general.

Employee: They call that a lieutenant general.

Chen: Yeah, in China, was the only thing different is we do have . . . the captain, the colonel, you have like lieutenant colonel, you have colonel. I was full colonel. I retire as full colonel [UI].

* * *

Chen: I kind of not publicly talk about myself unless I talk to students. I wouldn't say I was in the military because, because it's still different. I was in Chinese military, I didn't have U.S. military experience.

* * *

Chen: Actually, military life, I really, I have to say, it benefits a lot. My last post was I was on the space program as the planning director. Actually in China the space program is like dual use. However, for the technical people the government put all the technical people under the military control, everyone has to, they accept the research, they don't have rank. But anyone in the management has rank because they're in the military. Because they wanted to [UI] of the sites the program not going to pick the civilian, so we all have rank in my office. My entire office all of them are colonel, we even don't take any lower rank. Either junior lieutenant colonel and . . . I was the colonel . . . I was four colonels. So, I have five, six staff, all of them man. I enjoy working with them. They are colonel rank,

-7-

but they all below me. So because I was full colonel, of course we have other people, just supporting staff. I'm just saying entire office people has management responsibility, so that was a really fun time.

*Chen's False Statements on Immigration Documents*

17. On or about June 4, 1993, Yanping Chen filed an I-485[1] with the former Immigration and Naturalization Service, presently Citizenship and Immigration Services. The INS received the I-485 on or about July 1, 1993.

18. Chen made a false material statement in Part 3(C) of her I-485, which asked:

List your present and past membership in or affiliation with every *political organization*, association, fund, foundation, *party*, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any *foreign military service* in this part. If none, write "none". Include the name of organization, location, dates of membership from and to, and the nature of the organization. (Emphasis added)

19. Chen responded to this question by answering, "None." Chen did not disclose her foreign military service on this form.

20. Chen made a false material statement in Part 3, Question No. 6, of her I-485, which asked:

_____

[1]An Immigration and Naturalization Form I-485 (Application to Register Permanent Residence or Adjust Status) is an application filed by an alien seeking to adjust his or her status from that of a visa holder to that of a lawful permanent resident. One of the purposes of the I-485 is to ascertain the social, political, and criminal background of the applicant. This includes questions about social, military, and political organizations, and specifically membership in the Communist Party. An adjudicator for CIS will use the information provided by the applicant on the I-485 to interview the applicant. The adjudicator will go over the form with the applicant and confirm the applicant's answers orally. The adjudicator will tailor certain questions concerning the background of the applicant based upon the information provided on the form to determine whether the applicant is eligible to adjust status to that of a lawful permanent resident.

Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party?

21.    Chen marked the box "No." Chen did not disclose her affiliation with the

Communist Party, therefore thwarting any questioning an INS adjudicator may have had

regarding party affiliation through her military service, or otherwise.

22.    Chen signed the I-485 under penalty of perjury on or about June 4, 1993.  Chen's

I-485 was approved by the Immigration and Naturalization Service on or about September 27,

1993.

23.    On or about June 2, 2000, Chen filed an N-400[2] with the INS.  Chen signed the

N-400 under penalty of perjury.  The N-400 was received by the INS on or about June 5, 2000.

24.    Chen made a false material statement in Part 7, Question No. 1, or her N-400,

which asked:

> Are you now, or have you ever been a member of, or in any way
> connected or associated with the Communist Party, or ever
> knowingly aided or supported the Communist Party, or indirectly
> through another organization, group or person, or ever advocated,
> taught, believed in, or knowingly supported or furthered the
> interest of Communism?

---

[2]An Immigration and Naturalization Form N-400 (Application for Naturalization) is an application to naturalize as a U.S. citizen.  One can do this after one has become a lawful permanent resident for the prescribed period of time (usually five years).  One of the purposes of the N-400 is to ascertain the applicant's affiliation with organizations, funds, parties, etc., and specifically the Communist Party.  The form also covers questions regarding criminal background, specifically whether the applicant has ever made any false or misleading statements to gain an immigration benefit.  An adjudicator for CIS will use the information provided by the applicant on the N-400 to interview the applicant.  The adjudicator will go over the form with the applicant and will confirm the applicant's answers orally.  The adjudicator will tailor certain questions concerning the background of the applicant based upon the information provided on the form.

25.     Chen marked the box "No." Chen failed to disclose her military service in the

People's Liberation Army, whose mission is to support and protect the ruling party in the PRC,

which is the Communist Party. According to Dr. David Lai from the U.S. Army War College,[3]

the People's Liberation Army (or PLA) is the armed branch of the PRC Communist Party.

Members of the People's Liberation Army are required to pledge allegiance to the PRC

Communist Party. In addition, according to Dr. Lai, there is no separation between the People's

Liberation Army and the PRC Communist Party.

26.     Chen made a material false statement in Part 7, Question No. 15a, of her N-400,

which asked, "Have you ever . . . knowingly committed any crime for which you have not been

arrested?"

27.     Chen marked the box "No." I submit that this omission constituted a violation of

18 U.S.C. § 1001 (false statement), as well as 18 U.S.C. § 1546 (fraud and misuse of visas,

permits, and other documents), because, *inter alia*, while not arrested for them, Chen had

knowingly made false material statements on her I-485 and thereby had obtained a visa or permit

---

[3]According to the Army War College website, "Dr. David Lai is a Research Professor of Asian Security Studies at the Strategic Studies Institute (SSI) of the U.S. Army War College. Before joining SSI, Dr. Lai was on the faculty of the U.S. Air War College. Having grown up in China, Lai witnessed China's 'Cultural Revolution,' its economic reform, and the changes in U.S.-China relations. His teaching and research interests are in international relations theory, war and peace studies, comparative foreign and security policy, U.S.-China and U.S.-Asian relations, and Chinese strategic thinking and operational art. Dr. Lai is the author and co-author of many articles and books on U.S.-China and U.S.-Asian relations, and has co-edited several books on the subject, including *The PLA at Home and Abroad: Assessing the Operational Capabilities of China's Military* (with Andrew Scobell and Roy Kamphausen, Carlisle, PA: Strategic Studies Institute, U.S. Army War College, June 2010), and *Chinese Lessons from Other People's Wars* (with Andrew Scobell and Roy Kamphausen, Carlisle, PA: Strategic Studies Institute, U.S. Army War College, 2011). Dr. Lai holds a bachelor's degree from China and a master's degree and Ph.D. in political science from the University of Colorado."

(her lawful permanent residency card) by false statements and fraud, all violations of 18 U.S.C. § 1546, among other statutes.

28.    Chen made a material false statement in Part 9 of her N-400, which asked:

> List your present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place. Include any military service in this part. If none, write "none". Include the name of organization, location, dates of membership and the nature of the organization.

29.    Chen responded to this question by answering, "N/A." Chen did not disclose her foreign military service on this form.

30.    The INS approved Chen's N-400 on or about April 5, 2001. Chen was officially naturalized as a U.S. citizen on or about May 17, 2001.

31.    Being granted U.S. citizenship, Chen was able to apply for a U.S. passport. On or about May 22, 2001, Chen filled out and submitted a U.S. Department of State Form DSP-11 (Application for Passport), and on or about May 29, 2001, Chen was issued U.S. passport number xxxxx9566 with an expiration of May 28, 2011.

32.    Chen traveled outside of the United States on a number of occasions and used her U.S. passport number xxxxx9566 to re-enter the United States through the port of entry at Washington Dulles International Airport (IAD) which is located in the Eastern District of Virginia. Chen used the passport to enter the United States through IAD on March 30, 2008, April 15, 2008, May 24, 2008, December 7, 2008, January 9, 2009, May 19, 2009, July 4, 2009, September 17, 2009, and May 11, 2010.

33.     On or about May 18, 2011, Chen filed U.S. Department of State Form DS-82,

(U.S. Passport Renewal Application For Eligible Individuals). Chen was issued a new U.S.

passport number xxxxx4323 on or about May 24, 2011, with an expiration of May 23, 2021.

34.     Chen traveled outside of the United States on a number of occasions and used her

U.S. passport number xxxxx4323 to re-enter the United States through the port of entry at IAD.

Chen used the passport to enter the United States through IAD on July 30, 2011, September 28,

2011, and May 13, 2012.

35.     I submit that by "possess[ing], obtain[ing], accept[ing], or receiv[ing]" a U.S.

passport, Chen violated 18 U.S.C. § 1546, among other statutes, because, *inter alia*, her

citizenship was obtained through fraud and she therefore knew that her passport was "procured

by fraud or unlawfully obtained." I also submit that each entry into the United States was a "use"

of the passport that was "procured by fraud or unlawfully obtained" and therefore constituted a

violation of 18 U.S.C. § 1546.

*Chen's False Statements to Federal Agents from OPM*

36.     On or about September 14 and 15, 2011, the Office of Personnel Management,

Federal Investigative Service, interviewed Chen in connection with a background investigation

for a security clearance renewal for her son-in-law, Hu Zhen, a/k/a John Hu. Hu is a naturalized

U.S. citizen and holds a SECRET security clearance for his work at a U.S. defense contractor.

37.     During the interview, Chen denied that she had ever served in the PRC military.

She also denied that any of her family members or her first husband had ever served in the PRC

military.[4] Chen also denied that she had any contact with representatives of a foreign government, and she said that her companies, the Yankee Clipper Group and UMT, did not hold any contracts with representatives of a foreign government and did not receive any revenue from representatives of a foreign government.

38.     In or about October 2011, the Office of Personnel Management, Federal Investigative Service, interviewed Wang Lele, Chen's daughter and the wife of Hu, in connection with Hu's background investigation. Wang is the director of the dean's office and the marketing director at UMT. She has been working at UMT for approximately twelve years.

39.     During the interview, Wang said that her father (Chen's first husband) and her mother both had served in the PRC military. Wang did not know her parents' ranks, but recalled that her mother had had "two bars and one star" and that her father had had "two bars and three stars." Wang told the investigators that sometime after Chen married Frame, in 1996 or 1997, she returned to China and resigned from the PRC military. Wang also said that Chen's father had been a very high ranking member of the PRC military.

40.     Wang said that the students who attended UMT were mainly from the U.S. military. She also told the investigators that she believed that UMT received revenues from foreign governments and had contracts with them because the governments paid for students that attended UMT. Wang said that there were Chinese delegations that came to UMT every other month.

---

[4]During the interview, Chen had discussed her first husband, her mother, her sisters and brother, and family members on her first husband's side. Chen denied that she or any of these family members had any affiliation with the Chinese government or military.

41.     Wang was interviewed again by federal agents on May 7, 2012. She told the agents that her mother had served in the People's Liberation Army. She said that after she was interviewed by the Office of Personnel Management, she told her mother that she had told the interviewers that Chen had served in the PLA. Chen told Wang that Wang was mistaken.

*Chen's Efforts To Conceal Her PRC Military History*

42.     On March 14, 2012, Chen was recorded while talking with a contractor for UMT. Chen was then aware that FBI agents wanted to interview the contractor about Chen's past in the PRC military. Chen and the contractor discussed what the contractor might say.

> Contractor:    But I'm not going to bring up the Army shit because
>                I don't want them getting into my shit.
>
> Chen:          No, no, no, you don't have to, yeah, you really
>                didn't know my past. Say, "I really didn't know
>                why you get Army, and I really didn't know her."
>                . . . Just say, "I really don't know her, her past."
>
> Contractor:    I don't want them to trip me up and get me
>                bullshittin' them or lying or something.
>
> Chen:          No, if you don't know, then you don't know. Even
>                say, "Oh, she was in the military service?" You
>                should say, "I don't know," because you really don't
>                know.

43.     On March 27, 2012, Chen had another conversation with the contractor, who had told Chen that now the FBI and the U.S. Army wanted to interview the contractor. The contractor told Chen some of the questions he had been asked by the U.S. Army.

> Contractor:    "Why do you work for this woman? Why do you
>                work for a former Army officer of the," what's the
>                government called, "the People's Republic" or
>                something like that?

Chen:           Yeah.

Contractor:     Yeah, whatever, that shit. "And think about how much money you're getting paid, and work for . . . ."

Chen:           That's right, you simply [UI] "I'm working for the university, I'm not working for this lady. And she is not university, university is entire university." And the second thing is that, "Why you working for the former whatever?" "I don't know who she was."

\* \* \*

Chen:           . . . The second thing, "Why you work for this former blah blah?" You say, "I don't know about this." . . .

\* \* \*

Chen:           . . . If you say, "I choose to work for UMT, not for this lady." [UI] "Until after I work at UMT, I bump into this lady and get to know her." No, not that, "I bump into her and say 'Hi,' that's it. That's all the relationship." . . .

44.     On April 25, 2012, Chen was recorded when the contractor told Chen and Frame that he had been served with a grand jury subpoena to testify in May 2012. During the conversation, the contractor brought up how the FBI had called him and again questioned him over the phone about Chen's PRC military history:

Contractor:     [T]hey were, over the phone about "Why you working for a," the guy cussed or something, "Why you working for a former" [UI] He said, "Why you working for a former . . ."

Chen:           PLA? [UI]

Contractor:     . . . Chinese officer, yeah, some shit like that. I don't fuckin' know, she's my boss, she pays me, I

-15-

don't know what she did when she was [UI] or whatever.

\* \* \*

Contractor:   When we first met, I had a different level of respect for you anyways because you're a soldier too. You can relate to things I tell you, and kind of give me feedback but, I don't know, it just, Army people whether it's in the same country or, I've trained with people from all over the world and there's just a brotherhood and sisterhood whether you're enlisted or officer or whatever. There's just an unspoken underlying respect.

Chen:   And also underlying values, right?

\* \* \*

Chen:   You should not express your feeling about this person. Yeah, yeah. See this person understands me, this person has the same experience. They will ask you, what same experience you are talking about?

Contractor:   I understand what you're saying, but they can pretty much fuck off, excuse my language. I have respect for your wife, they can, if they bring up her service that's an honorable thing, whether it's China or whoever.

Chen:   Golly, you don't reasoning those, they don't share the same reasoning with you, so don't . . .

Frame:   Just answer yes or no. I think that's [UI] very surprised if they were going to ask any questions about her and her service or whatever outside of . . .

45.   During the same conversation, Chen told the contractor, "[I]f you don't know, you don't know, and don't be make additional comments, because that always can be the evidence come back to drag you more and more into this process . . . ."

-16-

| Chen: | I would say the attitude is honest. Say what you know, say what you don't know [UI] anything before you work for us, you have no direct knowledge, you don't know anything, so that area, you should not even touch it. |
|---|---|
| Contractor: | No, I won't. |

* * *

| Chen: | . . . Whatever happened to any one of the employee at UMT to anything happen to UMT you have no knowledge whatsoever. |
|---|---|
| Contractor: | No, I don't. |
| Chen: | Yeah, so what can you say? |
| Contractor: | Nobody around here, I really don't socialize with anybody but you. |
| Chen: | Why include me? You don't know me, even two years before that. |

46.     According to a former UMT student, Chen kept at least through January 26, 2012, a Chinese space rocket model on display in her office. The rocket appeared to be comparable to NASA's Saturn series rockets. After the discussions recounted above, however, a witness familiar with Chen's office noted that Chen no longer had any of her Chinese model rockets by her office window. Chen told the witness that the models had been damaged by a window cleaning crew.

*Chen's False Statements to Federal Law Enforcement Agents*

47.     On July 30, 2011, a Customs and Border Protection officer interviewed Chen at Washington Dulles International Airport upon her arrival on a direct flight from mainland China.

Chen told the CBP officer that she had been in the PRC military. During the same interview, however, she denied that her first husband had ever been in the PRC military.

48.     On January 31, 2012, FBI and NCIS agents interviewed Chen at her office suite. She told the agents that she had had a "management position" in the PRC space program and was a cardiologist involved in the standards used in the selection of PRC astronaut candidates. Chen said that this was a civilian position and that, while the space program "belongs" to the PRC military, civilian projects are at its core. Chen was asked, "Even as a civilian in a civilian management position in the Chinese space program, did you hold any military rank or wear a military uniform?" Chen replied, "It's like the Pentagon. There are many civilians at the Pentagon." The agents followed this by asking, "But did you have a military rank?" Chen replied, "No, I didn't have any rank."

49.     During the interview, Chen denied that she had ever served in the PRC military. Chen also claimed that she does not initiate contact with the PRC government and that, since the 1990s, she has had little interaction with the PRC government.

SEARCHING AND SEIZING COMPUTERS

50.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

        a.      Computer storage devices (like internal or external hard disk drives, compact discs (CD), digital video disc (DVD), flash drives, and others) can store the equivalent

of millions of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

51. In searching any digital storage media, we will, to the extent possible, use computers and forensic software to conduct the searches. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.     Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

b.     Surveying various file directories and the individual files they contain;

c.     Scanning storage areas;

d.     Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

e.     Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

f.     Opening files in order to determine their contents;

g.     Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

CONCLUSION

52.     For the foregoing reasons, I submit that there is probable cause to believe that Yanping Chen has committed violations of 18 U.S.C. §§ 1001 and 1546 and that fruits, evidence, and instrumentalities of such violations, that is, the items listed in Attachment B, will be found at Chen's company, University of Management and Technology, 1901 North Fort Myer Drive,

South Building, Suite 700, Arlington, Virginia, as further described in Attachment A-1, and

Chen's residence, 2122 21st Road North, Arlington, Virginia, as further described in Attachment

A-2.

Timothy S. Pappa
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed to before me
this 3rd day of December, 2012

_____/s/_____
John F. Anderson
United States Magistrate Judge
United States Magistrate Judge

*Premises to Be Searched*

University of Management and Technology
1901 North Fort Myer Drive, South Building, Suite 700, Arlington, Virginia

The University Management and Technology is in Suite 700 of the South Building at 1901 North Fort Myer Drive, Arlington, Virginia. The South Building is a multi-storied office building. The street-level exterior has concrete pillars, and the covered entrance, which faces 19th Street North, has the words "South Building" above it. The address "'1901 North Fort Myer Drive" appears on the side of the covered entrance. Two glass doors facing 19th Street North lead into the elevator lobby. Suite 700 is on the seventh floor, and entrance to the suite is through two glass doors with wood paneling. A sign to the right of doors reads, "University of Management and Technology."

A photograph of the South Building appears below.



*Premises To Be Searched*

<u>2122 21st Road North, Arlington, Virginia</u>

The residence at 2122 21st Road North, Arlington, Virginia, is a multi-storied residential townhouse with a brick exterior, green-colored door, and attached garage. The numerals "2122" appear to the left of front door, with a light above house number.

A photograph of the premises appears below.



*Items To Be Seized*

1. Any and all documents, information, and objects referring or relating to the employment history of Yanping Chen in the People's Republic of China (PRC), including, but not limited to, photographs, PRC passports, and identification documents issued by the PRC government.

2. Any and all documents, information, and objects referring or relating to the People's Liberation Army or any other military branch of the PRC, including, but not limited to, photographs, memorabilia, uniforms, and medals or decorations.

3. Any and all documents, information, and objects referring or relating to the Communist Party of the PRC.

4. Any and all documents, information, and objects referring or relating to any space agency of the PRC.

5. Any and all documents, information, and objects referring or relating to contacts between the PRC government and the University of Management and Technology or Yanping Chen.

6. Any and all travel-related documents, information, and objects for Yanping Chen, including, but not limited to, any passports, itineraries, and receipts.

7. Any and all immigration-related documents, information, and objects for Yanping Chen, including, but not limited to, documents of the Immigration and Naturalization Service, the Department of Homeland Security, the Bureau of Citizenship and Immigration Services, or the Department of State.

8. Any and all computer hardware or electronic media capable of containing any of the documents, information, and objects identified above, including, but not limited to, central processing units, desktop computers, notebook computers, laptop computers, hard drives, external hard drives, palm pilots, personal pocket computers, and tower computers, media capable of holding audio or video recordings, cassettes, disks, compact discs, digital video discs, thumb drives, flash drives, iPods and similar devices. User guides/manuals, cords, and passwords for the hardware and media described above.